UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| METRIS U.S.A., INC., <br> METRIS N.V., <br> METRIS IPR N.V., and <br> 3D SCANNERS LTD. <br>                 Plaintiffs, <br><br> v. <br><br> FARO TECHNOLOGIES, INC., <br>                 Defendant. | CIVIL ACTION NO. <br> 08-CV-11187-PBS |

**MEMORANDUM AND ORDER**

March 2, 2012

Saris, U.S.D.J.

## 1. INTRODUCTION

Defendant Faro Technologies, Inc. ("Faro") has filed a motion for limited additional claim construction with respect to a claim term of U.S. Patent No. 7,313,264 (the '264 patent). It requests that the court revisit its construction of the phrase "a data processor operable to process the electrical image data signals to generate processed data of reduced quantity" in light of prior art submitted as part of a Reissue Patent Application pending in the Patent Office. In Faro's view, the prior art has become part of the "intrinsic" evidence that the court should consider in determining the proper construction of the claims at issue. After hearing, the motion is **DENIED**.

## 2. BACKGROUND

The court has written extensively in this case and assumes familiarity with the '264 patent technology and the legal standards governing claim construction discussed in its earlier opinions. See Metris v. Faro Tech., No. 08-CV-11187-PBS, 2011 WL 4346852 (D. Mass. Sept. 19, 2011); Metris v. Faro Tech., 768 F.Supp.2d 338 (D. Mass. 2011); Metris v. Faro Tech., No. 08-11187-PBS, 2009 WL 3447237 (D. Mass. Oct. 22, 2009).

Claim 1 of the '264 patent reads as follows:

A scanning apparatus, comprising:

A multiply-jointed arm having a plurality of arm segments and a data communication link to transmit data; and

A scanner mounted on an arm segment of the multiply-jointed arm for movement therewith to capture data from a plurality of points on a surface of an object, *the scanner having a housing* enclosing:

(a) a light source operable to emit light onto the object surface;

(b) a light detector operable to detect light reflected from the object surface and to generate electrical image data signals in dependence upon the detected light; and

**(c) a data processor operable to process the electrical image data signals to generate processed data of reduced quantity, the data processor being connected to the data communication link to transmit the processed data therealong.**

Of importance to this dispute is the claim language which is in bold. Early in the litigation, the parties agreed that "data processor operable to process the electrical image data signals to generate processed data of reduced quantity" should be

construed as "a device with a program which performs computations to modify, manipulate, or transform electrical image data signals to generate processed data of reduced quantity." (Docket No. 77, 81)

### 3. DISCUSSION

Based on "new evidence", Faro seeks a different definition: "a device capable of performing operations on data, such as a digital computer, an analog computer, or a desk calculator that processes a three-dimensional image." In support of this new definition, Faro urges this court to treat U.S. Patent No. 5,193,120 to Gamache et al. as "intrinsic" evidence in the prosecution history. Faro relies on Ortho-McNeil Pharm., Inc. v. Caraco Pharm. Labs., Ltd., 476 F.3d 1321, 1324-25 (Fed. Cir. 2007) to support its argument that prior art cited in a pending reissue proceeding should be treated as intrinsic evidence for purposes of claim construction.

While prior art cited in a Reissue proceeding may be considered as "intrinsic evidence", prosecution history "'may not be used to infer the intentional narrowing of a claim absent the applicant's clear disavowal of claim coverage.'" Superguide Corp. v. DirecTV Enters., 358 F.3d 870, 875 (Fed. Cir. 2004) (quoting Amgen Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1327 (Fed. Cir. 2003)). For example, in Ortho-McNeil the patentee narrowed the disputed claim during the reissue proceeding to

3

distinguish it from the prior art.  See 476 F.3d at 1325. As Faro conceded during oral argument, this language in the specification does not demonstrate such a clear disavowal.[1]

Instead, Faro maintains that this Court should not construe the term "electrical image data signals" to include two-dimensional image data because centroid[2] processing was known in the prior art, that is, in the Gamache patent cited during the Reissue proceeding. "'[W]hen prior art that sheds light on the meaning of a term is cited by the patentee, it can have particular value as a guide to the proper construction of the term, because it may indicate not only the meaning of the term to persons skilled in the art, but also that the patentee intended to adopt that meaning.'" Kumar v. Ovonic Battery Co., Inc., 351 F.3d 1364, 1368 (Fed. Cir. 2003) (quoting Arthur A. Collins, Inc. v. Northern Telecom. Ltd., 216 F.3d 1042, 1045 (Fed. Cir. 2000) (involving prior art cited in the patent)). Faro has cited no intrinsic or extrinsic evidence to suggest that the term

---

[1] It cited the following language in the '264 patent: "Where the stripe crosses a row the position on the CCD array can usually be calculated to subpixel accuracy by one of several commonly used methods." (Col. 18., ll. 60-63).

[2] Faro explains that "[t]he centroid is two-dimensional pixel data that is then combined with arm position data to form a three-dimensional image." (Def.'s Mot. at 2).  Faro notes further that "Gamache confirms that reducing the laser stripe data by calculating the centroid, and then using a digital processor to transform the two-dimensional centroid pixel data into a three-dimensional point to create the image was known to persons having ordinary skill in the art at the time the '264 patent application was filed." Id. at 6.

"electrical image data signals" was understood by persons skilled in the art to mean only three-dimensional data. In ruling on the motion for summary judgment regarding Faro's contention that it did not infringe the '264 patent, the court rejected a similar argument involving the Cosnard patent:

> Faro does not dispute that the DSP is within the scanner housing or that it reduces the quantity of the data that the scanner initially captures.  Instead, Faro argues that because the data synthesized by the DSP is not three-dimensional image data, but rather, is one-dimensional pixel data, it is not "electrical image data" within the language of the claim.  In the accused product, the synthesis of three-dimensional data occurs when the center of gravity is combined with arm position data within the three-dimensional data processor on the host computer.  Because this function occurs outside of the scanner housing, Faro argues that the accused product does not have a data processor within the scanner housing, as the patent requires.
>
> But the plain language of the claim does not specify that "electrical image data signals" refers only to three-dimensional image data.  In fact, on one reading, claim one appears to presume that the three-dimensional data manipulation will occur *outside* of the scanner housing.  Both parties agree that in order to render three-dimensional data, the apparatus must combine laser image data with information regarding the position of the arm.  In claim one of the '264 patent, however, there is no limitation that arm position data must be run into the scanner head.  Instead, the "therealong" language indicates that image data will be passed via the data communication link *outside* of the scanner head and into the arm.  Under this account, electrical image data cannot possibly refer only to three-dimensional image data, because the device will not generate three-dimensional image data until the initial data captured by the laser line scanner is combined with data regarding the position of the arm.
>
> Faro's argument that the data manipulated by the DSP within the scanner housing is not "electrical image data" is based mainly on the '264 patent

> specification's reference to the possibility of moving the host computer into the scanner housing: "As computing power becomes faster and more compact, it will be possible to encapsulate the computer . . . in the probe . . . as well as having the display . . . mounted on the probe. The probe might have memory . . . which could be both dynamic memory and magnetic memory, such as a CD-ROM or digital video disk." <u>'264 patent</u>, col. 20, ll. 32-37. The quoted language indeed seems to envision the possibility of performing the full three-dimensional image synthesis in the scanner head. However, the specification does not overwhelm the language of the claim, which, interpreted according to its ordinary meaning, refers to "electrical data image signals" processed by the processor in the head, a term which could include one- or two-dimensional data initially captured by the scanner head. See <u>Johnson Worldwide Assoc., Inc.</u> v. <u>Zebco Corp.</u>, 175 F.3d 985, 989-90 (Fed. Cir. 1999) ("[C]laim terms cannot be narrowed by reference to the written description or prosecution history unless the language of the claims invites reference to those sources.").

<u>Metris</u> v. <u>Faro Tech.</u>, No. 08-CV-11187-PBS, 2011 WL 4346852, at *18 (D. Mass. Sept. 19, 2011) (emphasis added). Like Cosnard, Gamache provides no basis to reopen claim construction because the plain language of the claim does not specify that "electrical image data signals" refers only to three-dimensional image data.

Faro insists that a narrow construction of image data to include only three-dimensional data is necessary to preserve the validity of the '264 patent. In Faro's view, "Gamache confirms that reducing the laser stripe data by calculating the centroid, and then using a digital processor to transform the two-dimensional centroid pixel data into a three-dimensional point to create the image was known to persons having ordinary skill in the art at the time the '264 patent application was filed." (Def.'s Mot. at 6). It contends that the prior art (Gamache and

6

Cosnard) would render the asserted claims obvious if they covered the centroid technology.  However, the Federal Circuit has made clear: "Even if this were so, where claim language is clear we must accord it full breadth even if the result is a claim that is clearly invalid."  <u>Tate Access Floors, Inc.</u> v. <u>Interface Architectural Res., Inc.</u>, 279 F.3d 1357, 1372 (Fed. Cir. 2002).

The Court also rejects all arguments to do-over the claim construction based on dictionary definitions and language in the specification which was fully available to Faro during the first claim construction.  These arguments are waived and untimely.

### 4.   ORDER

The motion for limited additional claim construction (Docket No. 339) is denied.

                                         /s/PATTI B. SARIS
                                         Patti B. Saris
                                         United States District Judge